Elmwood-Anderson Corp. v Novello (2004 NY Slip Op 24128)

Elmwood-Anderson Corp. v Novello

2004 NY Slip Op 24128 [3 Misc 3d 858]

April 2, 2004

Supreme Court, Erie County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, July 7, 2004

[*1]
Elmwood-Anderson Corporation, Doing Business as Jimmy Mac's, Petitioner,
v
Antonia C. Novello, M.D., as Commissioner of Health of the State of New York, et al., Respondents.
Supreme Court, Erie County, April 2, 2004

APPEARANCES OF COUNSEL

Amigone, Sanchez, Mattrey & Marshall (Nicholas P. Amigone, III, of counsel), for petitioner. Frederick A. Wolf, County Attorney, pro se, and Joseph F. Reina for Anthony S. Billitier, IV, M.D., as Commissioner of Health of the County of Erie, and another, respondents.

{**3 Misc 3d at 859} OPINION OF THE COURT

Rose H. Sconiers, J. 
Petitioner, Elmwood-Anderson Corporation, doing business as Jimmy Mac's, initially commenced this CPLR article 78 proceeding against the above-named respondents because neither the New York State Department of Health nor the Erie County Department of Health had, as of that date, issued guidelines or rules for considering waivers under the Clean Indoor Air Act (CIAA) (Public Health Law § 1399-n et seq.), and because the Erie County Department of Health had not responded to petitioner's application for a waiver pursuant to Public Health Law § 1399-u. Before the first return date in this proceeding, the New York State Department of Health issued its waiver guidelines and criteria. As a result, petitioner agreed to discontinue this proceeding against respondents Antonia C. Novello, M.D., the New York State Commissioner of Health, and Kenneth {**3 Misc 3d at 860}A. Schoetz, Esq., Assistant Attorney General in Charge of the western New York office of New York State Attorney General Eliot Spitzer. Also, on that date, an agreement was [*2]reached between counsel for petitioner and counsel for respondents Anthony S. Billitier, IV, M.D., Erie County Commissioner of Health, and Frederick Wolf, Esq., Erie County Attorney, that the Commissioner would formulate and issue his own smoking waiver criteria and guidelines by January 23, 2004. It was further agreed that petitioner would then submit a revised waiver application based on those guidelines and that the Commissioner would thereafter issue a decision on petitioner's application for a waiver by a date certain.
Petitioner submitted its application for a waiver to the smoking ban on January 31, 2004. On February 6, 2004, the Commissioner issued a decision denying petitioner's application for a waiver of the smoking ban provisions of the CIAA. Petitioner thereafter served and filed an amended article 78 petition with exhibits. Along with the amended petition, petitioner provided this court with a copy of its waiver application. In the amended petition, petitioner seeks to have this court overturn the Commissioner's denial of its waiver application and to grant a two-year waiver of the smoking restrictions contained in the CIAA, under the conditions set forth in its application. Respondents answered the amended petition and oppose petitioner's request for a waiver to the smoking ban.
Public Health Law § 1399-n et seq. replaced and, in doing so, expanded the previously existing restrictions on smoking in public places. Most notably, this legislation, for the first time, prohibited smoking in bars. (Public Health Law § 1399-o [2].) The only statutory exceptions to indoor smoking restrictions included cigar bars, hotel or motel rooms, and, with certain limitations, membership associations. (Public Health Law § 1399-q.) Pursuant to Public Health Law § 1399-t, the board of health of a county with such an office is the "enforcement officer" for the CIAA and, therefore, has sole jurisdiction to enforce the CIAA on a county-wide basis pursuant to rules and regulations promulgated by the New York State Commissioner of Health. (Public Health Law § 1399-t [1].)
 Public Health Law § 1399-u (1) (a) and (b) provide that the "enforcement officer may grant a waiver from the application of a specific provision of this article, provided that prior to the granting of any such waiver the applicant for a waiver shall establish that . . . compliance with a specific provision of this article {**3 Misc 3d at 861}would cause undue financial hardship[,] or . . . other factors exist which would render compliance unreasonable." Moreover, even where a waiver is granted, such waiver "shall be subject to such conditions or restrictions as may be necessary to minimize the adverse effects of the waiver upon persons subject to an involuntary exposure to second-hand smoke and to ensure that the waiver is consistent with the general purpose of this article." (Public Health Law § 1399-u [2].) When the CIAA took effect on July 24, 2003, the smoking restrictions were effective immediately, but initially there were no procedures or guidelines of any kind for applying for or obtaining a waiver pursuant to Public Health Law § 1399-u.
On December 12, 2003, the New York State Department of Health issued implementation guidance with respect to various aspects of the CIAA, most notably the waiver provisions set forth in Public Health Law § 1399-u. The December 12, 2003 cover memorandum from Richard W. Svenson, P.E., Director, Division of Environmental Health Protection, which accompanied the implementation guidance, stated that "[c]ity and county officials may, in their discretion, choose to follow some or all of the waiver guidance." (See amended petition, exhibit B.) Following this memorandum, the Erie County Department of Health issued its own CIAA waiver criteria on or about January 24, 2004.
[*3]
Comparing the state guidelines for obtaining a smoking ban waiver with the Erie County waiver guidelines presents some significant differences. The state guidelines allow a waiver applicant to demonstrate undue financial hardship in one of three ways: loss of revenue amounting to at least a 15% reduction in sales tax receipts from the sale of food and beverages over a specified time frame, financial hardship due to capital expenditures prior to the law, or financial hardship due to other exceptional circumstances resulting in adverse economic impacts. The state guidelines also allow an applicant to demonstrate that there are safety or security factors that would make compliance unreasonable or that there are other factors that would make compliance unreasonable. (See amended petition, exhibit B.)
In contrast, the county guidelines seem to permit only one method of demonstrating undue financial hardship, namely, by "a precipitous, temporally related, and sustained reduction in New York State sales tax receipts of at least fifteen percent." While the state guidelines require an applicant to show that a reduction {**3 Misc 3d at 862}in sales tax receipts is not due to other factors, the county requires that "undue financial hardship must be clearly demonstrated to have been solely by enactment of the CIAA and all other factors must be shown to be unrelated." (See amended petition, exhibit C, at 1.) The county waiver application even requires an applicant to demonstrate that the undue financial hardship was caused by the CIAA and not the change in the legal limit for blood alcohol concentration when operating a motor vehicle, which was reduced from 0.10% to 0.08% effective July 1, 2003, just 23 days before the CIAA took effect. (See county waiver application, at 5, amended petition, exhibit C.) While, consistent with the statute, the county permits a waiver applicant to demonstrate "that other factor(s) exist that would render compliance unreasonable," there is no indication that such other factors include alternative methods of demonstrating undue financial hardship.
Under the state guidelines, as in the statute, where an applicant has demonstrated entitlement to a waiver in the first instance, there must also be a "description of conditions or restrictions that may be necessary for the facility to minimize the adverse affects of the waiver upon persons subject to an involuntary exposure to second-hand smoke and to ensure that the waiver is consistent with the general purposes of Public Health Law Article 13-E." Under the county guidelines, in order for a waiver to be granted, "applicants must provide a clear and detailed plan that is consistent with all requirements and conditions as outlined [in the application], and that includes a reasonable strategy that will enable conformity with the CIAA after the waiver has expired." (See county waiver application, at 6, amended petition, exhibit C.)
The conditions outlined in the county application include a dedicated indoor smoking area totally isolated from all nonsmoking areas by floor to ceiling walls, and that no service will be permitted in the smoking room, only patrons can bring drinks into the room, employees are not permitted in the room except prior to opening or 30 minutes after the facility closes or smoking has ceased, and the plan must include a method for removing garbage, glasses and the like from the room, and cleaning spillage and handling other problems in the room without employee entrance or exposure. The room must be equipped with self-closing doors that are equipped with an alarm that will be activated if the door remains open for more than 60 seconds. The doors must remain closed at all times except when entering or {**3 Misc 3d at 863}exiting. Air from the room must be exhausted [*4]directly to the outside in sufficient volume as to create negative air pressure and the negative air pressure must be maintained while the doors to the room are open. (Id.) The foregoing is a partial list of the conditions set forth in the county's application. Notably, none of these very specific requirements are contained in the state guidelines.
The state guidelines provide for a two-year waiver that will be reevaluated periodically and in response to complaints. While state issued waivers are not transferrable upon change of ownership, there is no indication that those waivers are not otherwise renewable after expiration of the two-year period. In contrast, the county application requires that an applicant "indicate how the business operation will be modified and/or new marketing strategies will be employed to enable conformity with the CIAA after the waiver expires." The county application then states that the maximum waiver period is 365 days. (See county waiver application, at 7, amended petition, exhibit C.)
In article 78 proceedings, the doctrine is well settled that when the issue concerns the exercise of discretion by administrative tribunals, the courts cannot interfere unless there is no rational basis for the exercise of discretion or the action complained of is arbitrary and capricious. (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, 34 NY2d 222, 230-231 [1974].) The arbitrary and capricious standard relates to whether a particular action should have been taken or is justified, and whether the administrative action is without foundation in fact. Arbitrary action is without sound basis in reason and is generally taken without regard to the facts. (Id. at 231; see, Heintz v Brown, 80 NY2d 998, 1001 [1992] [court's scope of review is limited to an assessment of whether there is a rational basis for the administrative determination; arbitrary action is without sound basis in reason and is generally taken without regard to the facts]; Matter of Arif v New York City Taxi & Limousine Commn., 3 AD3d 345, 346 [1st Dept 2004] [judicial review is limited to a determination of whether the administrative action was arbitrary and capricious or lacks a rational basis]; see also, Matter of Redanz v City of Buffalo, 4 AD3d 868, 869 [4th Dept 2004].)
With respect to administrative rule making, the Court in Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health (85 NY2d 326, 331-332 [1995]) wrote:
"The standard for judicial review of an administrative{**3 Misc 3d at 864} regulation is whether the regulation has a rational basis and is not unreasonable, arbitrary or capricious (see, Matter of New York State Assn. of Counties v Axelrod, 78 NY2d 158, 166; Matter of Bates v Toia, 45 NY2d 460, 464). An administrative agency's exercise of its rule-making powers is accorded a high degree of judicial deference, especially when the agency acts in the area of its particular expertise (see, Matter of Memorial Hosp. v Axelrod, 68 NY2d 958, 960; 5 Davis, Administrative Law § 29:3, at 343 [2d ed]). Accordingly, the party seeking to nullify such a regulation has the heavy burden of showing that the regulation is unreasonable and unsupported by any evidence" (citations omitted).
Of course, the foregoing necessarily presumes that the administrative agency had the statutory [*5]authority to issue a certain set of regulations in the first instance and, if so, whether those regulations exceeded the scope of the agency's rule making authority.
In denying petitioner's application for a waiver, the Commissioner wrote, in part, that "an applicant must show either that compliance with the CIAA has resulted in an undue financial hardship OR other factors exist that would render compliance unreasonable." (See amended petition, exhibit A.) The Commissioner then noted that, in order to establish financial hardship, "the [waiver] application must show among other things that the applicant has sustained at least a fifteen percent reduction in sales tax receipts." (Id.) While the state guidelines also use a 15% reduction in sales tax receipts as the most important measure of financial hardship, sales tax receipts are not the only method by which a business can establish undue financial hardship.
By contrast, under the county guidelines and the Commissioner's decision in this case, it is apparent that no business can establish financial hardship unless it has, at a minimum, demonstrated a 15% decline in sales tax receipts. While the county will look at other factors in addition to sales tax receipts, it is apparent that no applicant can establish financial hardship without first demonstrating the requisite 15% decline in sales tax receipts. Thus, under the county guidelines, it would appear that if an applicant establishes that it has gone from being a profitable ongoing business to unprofitable and ultimately insolvent due directly to the impact of the CIAA, such a business has not suffered "undue financial hardship" if its sales tax receipts {**3 Misc 3d at 865}did not decline by at least 15%. Such a result is clearly irrational. To the extent that the county guidelines provide only one method or measure of determining "undue financial hardship," those guidelines are arbitrary and capricious as well as irrational. Moreover, since the Commissioner applied that irrational standard in reviewing petitioner's waiver application, his decision is thereby arbitrary and capricious.
In applying for a waiver, petitioner has demonstrated that the profit margin for liquor sales is much greater than it is for food sales. Gross profits for liquor sales are greater than for food sales and the difference between the net profits for food versus liquor are even greater given the substantially higher labor costs associated with food preparation, service and cleanup. Thus, for any business like that of petitioner, it is apparent that sales tax receipts for the entire business do not tell the whole story where all or most of the decline in sales and the correspondingly disproportionate loss of profits is in the bar part of the business.
The facts in this case also demonstrate how arbitrary it is to use the decline in sales tax receipts as the sole overriding measure of financial hardship. Clearly, it is much more difficult for a restaurant/bar, such as petitioner's, to meet the 15% threshold than it would be, for example, for a bar that does not serve food or for which food service is only incidental. Since most or all of the profit is in the bar part of the business, the total decline in sales tax receipts does not accurately reflect the decline in profits, ultimately the most important measure of financial hardship.[FN*]

This court must also question, in measuring the impact of the CIAA, how [*6]fair it is to examine sales tax receipts for petitioner's entire business where the glass enclosed dining room does not allow smoking and did not allow smoking before July 24, 2003.
The Commissioner's decision did point to evidence that petitioner suffered a decline in liquor sales before the effective date of the CIAA, suggesting that there were reasons other than the smoking ban for petitioner's economic plight. Certainly, as in the state guidelines, it is reasonable to require a waiver applicant{**3 Misc 3d at 866} to demonstrate that a decline in business is related to the CIAA and not other causes. However, the county guidelines require an applicant to clearly demonstrate that the undue financial hardship is "caused solely by enactment of the CIAA and all other factors must be shown to be unrelated." Thus, in applying the county guidelines, it appears that even if the CIAA is the most significant factor in causing a business undue financial hardship, then that business would not be entitled to a waiver, even if it could be shown that the smoking ban would by itself make the difference between staying open or going out of business. Therefore, in this respect as well, the county guidelines are irrational because they would, as written, result in the denial of a financial hardship waiver to any business that cannot demonstrate that the CIAA is the sole reason for a decline in business, regardless of the significance of the CIAA in causing that decline.
The CIAA provides that when a waiver is granted, it shall be subject to such conditions or restrictions as may be necessary to minimize the adverse effects of the waiver. (Public Health Law § 1399-u [2].) The state guidelines seem to, for the most part, track the statute.
In contrast, the county guidelines place extraordinary waiver conditions on a business that go far beyond minimizing the adverse effects of the waiver. In fact, it is fair to say that if a business were to meet all of the conditions for a waiver set forth on page 6 of the county waiver application, then it would entirely eliminate employee and nonsmoking patron exposure to secondhand smoke. While this is a laudable goal, it is not what the CIAA requires in order to obtain a waiver. If a business was willing and able to meet all of the county's conditions for a waiver, then it would seem that this, by itself, would totally satisfy the purpose and intent of the CIAA. Under those circumstances, one might ask why it would be necessary to first establish undue financial hardship. After all, by meeting those extraordinary conditions, the business would have satisfied the full intent and purpose of the CIAA by totally eliminating exposure to secondhand smoke. Nevertheless, it is inconceivable that any business would be willing to make the investment necessary to meet the county's extraordinary conditions for a waiver since the maximum waiver period, under the county guidelines, is 365 days. For these reasons, the conditions that the county seeks to impose in order to obtain a waiver are also irrational, both because of the lengths a business would have to go {**3 Misc 3d at 867}to comply and because the maximum waiver period is one year in length. There is nothing in the CIAA suggesting that a waiver can be arbitrarily limited to a maximum of one year.
This brings us to the issue of whether the county exceeded its authority in issuing these very restrictive and limiting waiver criteria. Public Health Law § 1399-r (3) provides:
"Smoking may not be permitted where prohibited by any other law, rule, or regulation of any state agency or any political subdivision of the state. Nothing herein shall be construed to restrict the power [*7]of any county, city, town, or village to adopt and enforce additional local law, ordinances, or regulations which comply with at least the minimum applicable standards set forth in this article."
The county respondents cite this section for the proposition that the Commissioner had the authority to issue its own waiver guidelines. To the contrary, there is nothing in this section allowing county commissioners of health, who are the enforcement officers under the CIAA, to legislate or expand the law. Public Health Law § 1399-r (3) is merely a nonpreemption provision that would, for example, allow the Erie County Legislature and County Executive to enact smoking restrictions that are more expansive than the CIAA. In further support of this conclusion is the fact that Public Health Law § 1399-x provides, in part, that the state "commissioner [of health] shall not promulgate any rules or regulations that create, limit or enlarge any smoking restrictions." There is nothing in the CIAA suggesting that a county commissioner can do what the state commissioner cannot.
Certainly, as the local enforcement officer for the CIAA, the Erie County Commissioner of Health has, within limits, the right to exercise his discretion in granting waivers and in setting conditions for those waivers. However, as a reading of the county's waiver guidelines reveals, the Commissioner has actually expanded smoking restrictions by imposing an exceptionally narrow and inflexible measure of what constitutes undue financial hardship, imposing extraordinarily broad conditions on those applicants that are otherwise eligible for a waiver, and then limiting all waivers to a single 365-day period.
With that being said, it is not the role of this court to substitute its judgment for that of the statutorily appointed enforcement officer under the CIAA. Thus, while the county's waiver guidelines are, on their face and as applied in this case,{**3 Misc 3d at 868} arbitrary and capricious, irrational and issued without statutory authority, it is nevertheless the role of the Commissioner to, pursuant to the CIAA, review and decide waiver applications and to then set reasonable conditions in those cases where entitlement to a waiver has been established. Nevertheless, and as suggested by the foregoing discussion, the state guidelines, while not expressly subject to review in this proceeding, present a broader and more flexible approach to reviewing and determinating waiver applications under the CIAA. Even then, however, this depends on how the state guidelines are interpreted and applied. For example, the third method of determining undue financial hardship under the state guidelines, i.e., "other exceptional circumstances resulting in adverse economic impact(s)," in order to be acceptable, would have to allow an applicant to submit proof of loss of business revenues, even if the applicant did not have the 15% reduction in sales tax receipts required by the state's first method of proving economic hardship. (See amended petition, exhibit B.)
For these reasons, the Commissioner's denial of petitioner's waiver application is hereby vacated and this matter is remanded for further review and consideration not inconsistent with this decision. While it would not be appropriate for this court to determine, in the first instance, whether petitioner has suffered undue economic hardship and, if so, to then set conditions for a smoking ban waiver, some temporary relief is warranted given the substantial proof of adverse financial impact offered by petitioner and the inordinate length of time that this entire process has taken. Petitioner began the waiver application process with a letter from its president, Richard Naylon, to the Commissioner on September 11, 2003. It was followed by a much more [*8]detailed letter application from petitioner's counsel on October 1, 2003. No real consideration was given to petitioner's application until after this proceeding was commenced by order to show cause, granted December 1, 2003. This ultimately led to a denial of petitioner's waiver application on February 6, 2004.
For these reasons, petitioner is hereby granted a waiver from the strict provisions of the CIAA for a period of six months from the date of this memorandum decision and order, provided that there is compliance with all of the conditions set forth in petitioner's application, with the exception of those conditions that would require a substantial capital expenditure. The parties are encouraged to examine and evaluate all financial data generated {**3 Misc 3d at 869}during this waiver period and to consider other exceptional circumstances resulting in adverse economic impact causally related to the CIAA.

Footnotes

Footnote *: This court does not find it irrational to use declining sales tax receipts as an important or even primary measure of financial hardship. Sales tax receipts do provide an objective measure of a business' sales and are less subject to accounting manipulation than profits or some other financial figures. However, for the reasons stated, the decline in sales tax receipts cannot be the sole overriding measure of financial hardship.